UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCH OF:
DELL LAPTOP MODEL XPS
WITH DELL SERIAL TAG 73C0X93

Case No.  5:23-mj-5331

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Tra'sean James, Special Agent with the United States Department of Health and Human Services, Office of the Inspector General, being duly sworn, depose and state that:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent ("SA") with the United States Department of Health and Human Services ("HHS"), Office of the Inspector General ("OIG"), Office of Investigations ("OI") since May 2021. I am currently assigned to the Louisville, Kentucky, Field Office. I am empowered to investigate offenses involving HHS funds, which include Medicare, HHS grants, HHS Contracts, and state-run Medicaid programs.

2. Prior to being hired as a Special Agent with HHS, I was employed by the Kentucky Department of Insurance, Fraud Investigation Division as a criminal investigator for six and a half years. I completed 22 weeks of formal training at the Kentucky Department of Criminal Justice Training in 2015 to receive my Peace Officer Professional Standards Certificate. In my duties as a criminal investigator, I investigated allegations of insurance fraud, health care fraud and drug diversion.

3. During my time as a criminal investigator, I also served as a Federal Task Force Officer with the Federal Bureau of Investigation's ("FBI") Complex Financial Crimes Task Force for three years. During my time with the FBI, I investigated cases involving health care fraud,

insurance fraud, identity theft, drug diversion, money laundering, illegal kickbacks, and misbranding of drugs.

4. In my capacity as an HHS-OIG Special Agent, I have received specialized training and have experience in the investigation of federal health care fraud offenses and HHS funded programs.

5. I graduated from the Federal Law Enforcement Training Centers' ("FLETC") Criminal Investigator Training Program ("CITP") in 2021. CITP involved 12 weeks of formalized training and included many hours of instruction on federal criminal law to include federal criminal fraud and drug statutes. In addition to the training I received in CITP, I have received four weeks of specialized training through the HHS-OIG National Training and Operations Branch; training about how to conduct health care fraud investigations involving Medicaid and Medicare Parts A, B, C, and D, and training to investigate contract and grant fraud.

6. I have participated in the execution of numerous state and federal search warrants in numerous states and judicial districts. These warrants authorized searches of homes, businesses, offices, pharmacies, hospitals, and clinics. I have testified before grand juries, regarding criminal cases involving fraud. I have written search warrant affidavits and sworn to them under oath.

7. During my time as a Criminal Investigator, Federal Task Force Officer, and Special Agent, I have collaborated with other investigators in HHS-OIG and from other agencies and have learned while gaining experience of investigating health care fraud matters and other complex financial crimes. Based on these experiences and others, I am familiar with federal laws relating to different types of fraud, as well as schemes that are perpetrated to commit fraud.

8.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 641 (theft of government property), 18 U.S.C. § 1031 (major fraud against the United States), 18 U.S.C. § 1343 (wire fraud), and conspiracies to commit these offenses (the "SUBJECT OFFENSES") have been committed by known and unknown persons. I have probable cause to believe that a search of the property, described below, which is the subject of this affidavit, will reveal evidence of violations of the SUBJECT OFFENSES.

9.      I make this affidavit in support of an application for a search and seizure warrant to search the following: DELL laptop issued to K.J. by U.S. Medical Glove Company, currently in the possession of the U.S. Department of Health and Human Service-Office of Inspector General, Louisville Field Office, via consent of K.J. (the "SUBJECT LAPTOP").

10.     The matters set forth in this affidavit are either known personally to me or were related to me by other persons acting in their official capacities as law enforcement officers or employees of both domestic and foreign law enforcement agencies. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

11.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

**GOVERNMENT CONTRACTING DURING THE COVID-19 EMERGENCY**

12. In the early spring of 2020, the COVID-19 pandemic hit the United States. Among the responses from government was legislation which provided funding to the United States Department of Health and Human Services ("HHS") to support the development of domestic sources for personal protective equipment ("PPE"). For certain contracts, HHS partnered with other federal agencies, including the United States Department of Defense ("DOD"), and departments within DOD, to assist with reviewing and awarding contracts.

13. The Department of Air Force Acquisition COVID-19 Task Force ("DAF ACT") was one such entity. According to a November 11, 2020, announcement, DAF ACT would seek bids for contracts for the "replenishment of the Strategic National Stockpile (SNS) and [to] expand the domestic manufacture of key medical personal protective equipment (PPE) items." The November 2020 announcement explained it sought "innovative, commercial technologies that propose new solutions and/or potentially new capabilities that fulfill requirements, close capability gaps, or provide potential technological advancements in support of the COVID-19 Response Acquisition Task Force (DAF ACT) mission to provide relief, resilience, recovery, and stability to the nation in response to the COVID-19 pandemic." "Gloves/Gowns" was one of the identified "mission focus areas."

14. To be awarded a contract under this program the applicant was required to advance through several "spirals," which required submission of a written "Solution Brief" (Spiral 1), an optional oral presentation (Spiral 2), and a Request for Commercial Solution Proposal (Spiral 3).

**RELEVANT INDIVIDUALS & ENTITLES**

1. U.S. Medical Glove Company ("USMGC") is a Kentucky limited liability company founded in or around 2020 with a physical address on Triport Road in Georgetown,

4

Kentucky. According to public reporting, in or around May 2021, USMGC entered into an approximately $65 million contract with DOD to manufacture 24 machines capable of delivering approximately 1.1 billion FDA-certified nitrile gloves within 24 months.

2. According to the investigation, including interviews and review of documents, I have identified the following individuals as relevant to the investigation:

   a. John Todoroki is alleged to have controlled USMGC, though he did not have an official title or role, and had no legal ownership of the company. John Todoroki and others took steps to conceal from the government the full extent of his connection to and control of USMGC.

   b. Dylan Ratigan was the CEO of USMGC between in or around May 2021 and January 2022.

   c. Cash Gordian was the Chief Contracts and Compliance Officer for USMGC between in or around July 2021 and at least February 2023. In or about January 13, 2022, Gordian authored a "whistleblower letter" outlining his concerns about USMGC but reportedly did not send it to anyone.

   d. Military Member A is a retired Major General from the U.S. Army and was the first CEO and manager of USMGC. Military Member A owns a company called Company A, which holds a 10% ownership stake in USMGC. Military Member A was fired by Todoroki approximately 10 days before the government contract was signed.

   e. John Gibson was the Chief Operating Officer at USMGC from its formation through in or around September 2022.

  f. Ken Wilson was the Chief Technical Officer and Head of Operations at USMGC between in or around May 2021 and February 2022.

  g. Sai Aung Khaing "AK" is a citizen and believed to be a resident of Myanmar and is an associate of John Todoroki.

  h. Alex Todoroki is John Todoroki's oldest son.

  i. Jake Todoroki is John Todoroki's youngest son and according to information received during the investigation, is listed on USMGC records as an employee at USMGC and he collects a salary.

  j. Ann Skemp Todoroki is John Todoroki's wife and according to information received during the investigation, received a new Ford Explorer purchased by USMGC.

## PROBABLE CAUSE

**I. Overview**

3. In or around November 2021, HHS received an anonymous hotline complaint forwarded from the Defense Contract Audit Agency alleging theft involving USMGC's contract to produce gloves. The complainant alleged that the company had no prior experience in manufacturing. It further alleged that, although USMGC purportedly began operations in October 2020, as of November 2021, the company had only one employee, the president, and no manufacturing plant. Additionally, in or around January 2023, counsel representing Dylan Ratigan contacted the Fraud Section of the Department of Justice to report alleged fraud in connection with U.S. Medical Glove Company's May 2021 contract with DOD.

4. Based on the investigation, as described in more detail below, there is probable cause to believe that the SUBJECT OFFENSES were committed, and that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT LAPTOP.

## II. USMGC Awarded Government Contract

5. According to materials provided by Ratigan, WPP 3MP was a company formed in or around July 2019 by Alex Todoroki at John Todoroki's direction. Initially, WPP 3MP was owned 20% by Ratigan, 20% by Alex Todoroki, and 60% by a Todoroki family trust.

6. According to materials provided by Ratigan, in the summer of 2020, Ratigan and John Todoroki discussed starting a glove manufacturing company. Ratigan and Todoroki contacted a rubber manufacturer located in Germany which they hoped had equipment they could use in their new glove manufacturing business.

7. In or around the Summer of 2020, WPP 3MP and the German rubber manufacturer signed a Memorandum of Understanding which would allow WPP 3MP to obtain the rights to develop a machine in America to develop gloves based on some of the German rubber manufacturer's designs.

8. In or around October 2020, Military Member A incorporated USMGC. According to materials obtained from Ratigan, as of October 2020, WPP 3MP owned 65% of USMGC, Military Member A, through Company A, owned 10%, and Gibson owned 5%, with the remaining shares outstanding.

9. On or about November 16, 2020, a representative from the U.S. Army emailed Ratigan and John Todoroki with the subject "CSO for Gloves." The email stated, "[b]ased on market research we are aware that U.S. Medical Glove Co. LLC is working in the glove industry. As such, we wanted to make you aware of a newly opened contracting vehicle to expand the industrial base for gloves in the US through the Commercial Solutions Opening (CSO)…This request for proposal is an excellent opportunity to receive government support in expanding the capabilities of glove-making within the United States to support the nation's needs."

10. Thereafter, Military Member A assisted USMGC in submitting its application materials. According to materials provided by Ratigan, USMGC submitted its application materials between in or around December 2020 through May 2021. On or about May 27, 2021, USMGC was awarded a contract, which Ratigan signed on behalf of USMGC. The contract required USMGC to make 24 machines capable of delivering approximately 1.1 billion FDA certified nitrile gloves within 24 months, for which USMGC would receive approximately $64 million. Among other requirements, the contract required USMGC to file periodic progress reports on its work, which included certain interim milestones.

### III.     USMGC Disclosures Regarding its Ownership

11. John Todoroki's association with USMGC was not disclosed as part of the application for USMGC's gloves contract. However, interviews and other materials collected during the investigation suggest that John Todoroki exercised control over the day-to-day operations of USMGC and made final decisions regarding financial matters.

12. According to an interview with Military Member A, John Todoroki made every decision when it came to USMGC, and John Todoroki referred to himself as the "majority shareholder," even though, on paper, he had no ownership interest in the company.[1]

13. According to an interview with Wilson, John Todoroki hid his involvement at USMGC until the government contract funding was approved. Wilson opined that the government would not have wanted John Todoroki running the company.

---

[1] Military Member A was terminated from USMGC in or around Spring of 2021. Military Member A told law enforcement that s/he believed there was illegality in the contract process because there is an obligation to tell the truth to the government and also to disclose adverse information to the government. Military Member A notified USMGC members regarding his/her wanting to tell the government about USMGC's corporate structure. Later that day, Military Member A received an email from one of John Todoroki's sons firing Military Member A and threatening litigation if Military Member A contacted the government about these issues.

14.     In addition, individuals working as contractors with USMGC during the relevant time period confirmed their understanding that John Todoroki was running USMGC. According to an interview with R.G., who owned a company that contracted with USMGC, Company B, John Todoroki was one of the owners of USMGC. During their working relationship, John Todoroki offered R.G. a job at USMGC. Another contractor, D.B., reported his/her interactions with John Todoroki at USMGC and explained that John Todoroki was leading the research and development efforts at USMGC. D.B. also noted that John Todoroki never spoke of his title but led all the meetings. D.B. believed it was odd for Todoroki to run meetings without an official position at the company.

**IV.     USMGC Interim Reports Regarding Progress Under Government Contract**

15.     As part of USMGC's contract, it was required to provide regular progress updates to the federal government. A number of the reports stated that multiple machines were operational and producing gloves during the relevant time period. For example, USMGC's progress report for the period between February 15 and March 15, 2022, stated that "USMGC has now validated the machine production at 55 feet per minute current capability at 188 gloves per minute." However, at this time no machines were functional, according to individuals interviewed who had access to and observed the work site.

16.     The reports also falsely stated that USMGC had secured orders for millions of gloves. For example, in a "summary of work completed" during the period of May 27-July 9, 2021, USMGC reported that its "first order [wa]s to a Fortune 10 company" for "60,000,000 Liberty Gloves per month." However, according to interviews of individuals associated with USMGC during the same time frame, and materials provided by Ratigan, the statements in these progress reports were false, because USMGC had not secured any orders for gloves. Furthermore, interviews with individuals on-site at the manufacturing facility, such as R.G. and D.B., advise

that there were no gloves being produced at this time. Additionally, a progress report submitted to the government by the Chief Manufacturing Officer, Jorge Rubin in March 2023, shows an official milestone schedule that has "0" production lines between May and July 2021.

17. For example, in or around January 2023, law enforcement interviewed D.B., who worked for a subcontractor that was performing services for USMGC. D.B. reported that he was onsite at USMGC's manufacturing facility in Montgomery, Illinois around the end of 2021, and that USMGC did not have any machines assembled at that time. D.B. also reported that USMGC was not making payments for D.B.'s company's work. D.B. also confirmed that D.B. took direction on work for USMGC from John Todoroki.

18. In addition, R.G., another contractor doing work onsite at USMGC reported that, as of November 2021, there were no operational machines at USMGC's manufacturing facility. R.G. reported that once one of the machines was up and running at a later date, the machine did not produce gloves with the necessary specifications. Further, the machine was not producing gloves at a fast enough rate. R.G. reported that John Todoroki brought in experts to look at the machines in an attempt to fix the problems, but R.G. observed that John Todoroki dismissed these experts if John Todoroki did not like their advice. R.G. also reported that at one point, R.G.'s company was told to "stage certain things to make things look [as] good as possible," such as putting machines and the frames up when the machines were not functioning.

19. According to Wilson, he was responsible for signing the progress reports sent to the United States. Wilson reported to law enforcement during his April 2023 he became uncomfortable with signing the reports at some point due to "stretching" what the reports said. Wilson confirmed that he signed some of the reports even though he was uncomfortable with doing so. As an example of what constituted "stretching," Wilson explained that the reports overstated

the progress, such as reporting that there were five machines, when in fact there were only *the components* for five machines, none of which were actually operational.

V.    **Use of Funds Under the Government Contract**

20.    Government funds provided under the USMGC glove contract were intended to be used consistent with the contract, that is, to achieve the objectives stated in the contract to increase the United States' domestic supply of FDA approved nitrile gloves. However, the investigation has determined that funds provided under the contract were misused.

21.    Specifically, Wilson reported that Ratigan purchased a number of Ford Explorers using company funds, and Wilson reported hearing rumors that one of the cars was shipped to Colorado, where John Todoroki lived.

22.    As a contractor working at USMGC, D.B. observed that at the USMGC facility, the company provided catered food and stocked vending machines for staff and contractors.

23.    A review of USMGC's bank records revealed numerous large expenditures on luxury hotels, meals, and vehicles, many of which do not appear consistent with legitimate business expenditures authorized under the contract.

24.    USMGC received its first payment from the government under the contract in August 2021. The company then proceeded to spend large sums of money at various hotels (in Illinois, New York, and Colorado) and restaurants and purchased multiple vehicles, at least one of which does not appear to have been used for legitimate business purposes.

25.    For example, over a five-day period in late September 2021, the primary business checking account for USMGC accrued nearly $6,000 in charges at the Westin Riverfront Resort and the Ritz Carlton in Avon, Colorado. Bank records show that WPP 3MP LLC has a mailing address of PO Box 19448, Avon, Colorado. Additionally, intel reports frequently used by law enforcement show Ann Skemp Todoroki, Jacob Todoroki, and Alex Todoroki all have multiple

11

addresses associated to them in Avon, Co. John Todoroki has an address of P.O. Box 5112, Edwards, Colorado. Avon, Colorado and Edwards, Colorado are within 10 minutes of each other according to Google Maps.

26. In addition, between October 18, 2021, and December 24, 2021, another USMGC bank account accrued over $90,000 in charges at the Hotel Arista in Naperville, IL. The Hotel Arista describes itself on its website as, "Naperville's Only AAA Four Diamond Luxury Hotel and Spa." Though the hotel is close to the manufacturing facility in Illinois operated by USMGC (so some of these charges may be legitimate business travel expenses), the amount of charges accrued during this short time period, however, suggests misuse of funds by USMGC. For instance, on December 6, 2021, USMGC spent over $14,000 at the Hotel Arista. And on December 24, 2021, USMGC spent over $12,000 at the hotel. Moreover, on October 18, 2021, USMGC incurred nearly $4,000 in charges at the Hotel Arista in Naperville while also incurring $3,000 in charges at The Langham Hotel, a five-star luxury hotel in downtown Chicago.

27. USMGC also spent exorbitantly on meals in late 2021. For example, on August 17, 2021, just ten days after receiving its first draw from the government, USMGC spent over $2,700 at Shaw's Crab House and Chicago Cut Steakhouse in Chicago, IL.

28. USMGC also spent large sums of money on vehicles. For example, during a two-day period in late October 2021, USMGC spent $155,000 at a Ford dealership in North Aurora, IL. Agents learned that at least one of the vehicles purchased during this time was subsequently shipped to Colorado. USMGC did not have any business operations in Colorado, but members of the Todoroki family did live there.[2]

---

[2] Records received by the dealership that sold the vehicle show that Ford Explorer with VIN 1FM5K8LC5MGC47365 was purchased October 29, 2021. A copy of a New York State driver license for Ratigan accompanied the purchase records. Records also show the vehicle was shipped to 150 Clayton Lane, Denver,

## VI.     Interview of K.J. Regarding USMGC

29.     In or around June 2023, law enforcement interviewed K.J., who was employed at USMGC as Controller beginning in or around September 2021 and continuing until in or around May 2022.[3]

30.     K.J. understood that John Todoroki was one of the owners of USMGC. Despite working as the Controller, K.J. was never given information about the company's ownership structure that was necessary to accurately allocate partner payments, which was a required function of K.J.'s job. K.J. reported that John Todoroki seemed to oversee USMGC and directed everything in the building and management. K.J. described John Todoroki as a bully and "litigation warrior" who said that everyone sues everyone in the business world. K.J. reported that John Todoroki threatened to have people followed and made a habit of not paying people and then challenging the person to sue him for payment. K.J. recalled specific vendors that USMGC was not paying despite owning them money. This included K.J.'s relative who owned a company subcontracting with USMGC, Company B. K.J. reported that USMGC did, however, make payments to certain Todoroki relatives, including approximately $70,000 to Jake Todoroki annually, despite his not performing any services for USMGC. K.J. reported that John Todoroki spoke openly about being a fugitive from Myanmar for a wrongful conviction. K.J. reported that this led John Todoroki to put things in his children's name and avoid signing anything himself.

---

Colorado 80206, which records show is an address for Hotel Clio. According to an interview conducted with the General Manager of the dealership, Ratigan advised the vehicle needed to be sent "ASAP to Colorado to one of the VPs". Additional records from Ford Pass show the vehicle owner as Dylan Ratigan.

[3] K.J. reported to law enforcement that K.J. initially had a functioning relationship with John Todoroki, but it later deteriorated.

31. K.J. also stated that K.J. was aware that John Todoroki and Gibson altered some documents to make it appear that Ratigan was never an owner of USMGC.

32. Further, K.J. confirmed that the money given to USMGC by the government was USMGC's only revenue. K.J. reported certain of the ways that USMGC spent its funds. K.J. stated that USMGC paid bonuses to certain individuals using the government contract funds, including John Todoroki, Ratigan, Gordian, and certain relatives of John Todoroki. K.J. also said that on one occasion Gibson instructed her to wire approximately $300,000 to $364,000 to TKT Associates. K.J. believed these wires were strange and did not seem like a legitimate business expense. K.J. said that the wires were sent in or around December 2022 and were supposed to be for the repurchase of shares of WPP.

33. At the time K.J. left USMGC in or around May 2022, K.J. stated that USMGC was still not making any gloves.

34. USMGC gave K.J. a laptop to use as part of K.J.'s role at USMGC. K.J. had possession of the laptop until she provided it to law enforcement in July 2023, where it is currently still in the possession of law enforcement. K.J. reported the laptop contained employment agreements, payroll lists, information on bonuses paid and wires, Quickbooks and other financial records for USMGC, including the repurchase agreements related to the repurchase of shares of WPP and related wires. K.J. reported that everything she did for USMGC is on the laptop, including all documentation on the money movement for the company.

35. K.J. reported that K.J. tried to return the SUBJECT LAPTOP to USMGC. K.J. informed USMGC in writing on at least one occasion and discussed with USMGC in at least another occasion that K.J. had the laptop and requested that USMGC make arrangements for her to return the laptop. Despite these communications, however, USMGC never made any attempts

to collect the laptop. K.J. provided law enforcement with a copy of the writing to USMGC advising that K.J. had the SUBJECT LAPTOP.

## CONCLUSION

36. Based on the information set forth above, your affiant submits that there is probable cause to believe that, in the timeframe discussed above, in the Eastern District of Kentucky and elsewhere, USMGC, its employees, and affiliates were involved in a scheme to fraudulently obtain a government contract and funds under the government contract in violation of the SUBJECT OFFENSES.

37. Based upon the facts set forth herein, I submit that there is probable cause to search the SUBECT LAPTOP, as described in **Attachment A**, and seize the items described in **Attachment B**. From my experience and training in investigating fraud, I know that individuals engaged in crimes such as these often maintain electronic records pertaining to their crimes, as well as instrumentalities and fruits of their crimes. Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic storage media or electronically stored information that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.

## SEALING REQUEST

38. I respectfully request that this Affidavit and the application and search warrant be sealed until the execution of the search warrant. Disclosure of the Affidavit at this time would also seriously jeopardize the ongoing investigation, as the targets would not otherwise be aware of the scope of this warrant or that their activities are currently the subject of an ongoing federal investigation. Disclosure at this time would provide the targets with the opportunity to destroy

evidence, change patterns of behavior, notify co-conspirators, or flee. Furthermore, the investigation in this matter is continuing, and disclosing the Affidavit's contents prior to execution will likely preclude or impede the agents and investigators working on this matter from investigating new criminal activity or leads.

Respectfully submitted,

/s/ Tra'sean James
Tra'sean James, Special Agent
Health and Human Services, Office of Inspector General

Attested to by applicant by reliable electronic means per FRCrP 4.1 on this 22nd say of September, 2023.

Honorable Matthew A. Stinnett
United States Magistrate Judge
Eastern District of Kentucky